IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| HERITAGE REALTY MANAGMENT, INC., ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | C.A. No. 06-47 Erie |
| ) | District Judge McLaughlin |
| SYMBIOT SNOT MANAGEMENT NETWORK, ) | |
| LLC, *et al.*, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION**

McLAUGHLIN, SEAN J., J.

This matter is before the Court upon Defendants' First Motion for Partial Summary Judgment (Dkt. #19), Defendants' Second Motion for Summary Judgment (Dkt. #28), and Plaintiff's Cross-Motion for Partial Summary Judgment (Dkt. #23).

**I.    BACKGROUND**

This action arises out of a contract entered into between Plaintiff, Heritage Realty Managment, Inc. ("Heritage"), and Snow Management Group, a snow removal company owned and operated as a sole proprietorship by John Allin ("Allin"). (Complaint, ¶ 6). Heritage is a publicly traded company that owns and manages commercial real estate throughout the United States. (Zicht Depo., Heritage's Exhibit A, p. 4). Snow Management Group operated on a national scale by hiring subcontractors to perform snow removal and salting for property owners, such as shopping plazas, that contracted with Allin for those services. (Allin Depo. 1/23/06, Heritage's Exhibit D, pp. 23-28).

Heritage and Allin, acting on behalf of Snow Management Group, negotiated and executed a written contract dated October 12, 2004 (the "Snow Removal Contract") whereby Allin agreed to provide snow removal, plowing, shoveling, salting, and other snow management services at various

1

properties owned or managed by Heritage.  (Snow Removal Contract, Heritage's Exhibit B).  On October 13, 2004, in anticipation of the services that Snow Management Group was to perform under the Snow Removal Contract, Heritage paid an initial deposit to Allin in the amount of $340,482.90.  (Complaint, ¶ 8; Allin Depo. 1/23/06, p. 37).

At the time of the contract, Allin also operated a landscaping business and was in the process of developing a snow melting business.  Snow Management Group had grown so rapidly in the years preceding the Snow Removal Contract that Allin had begun to experience cash flow and cash management problems.  (Id. at pp. 30-31).  During the months preceding the execution of the Snow Removal Contract, Allin had been unable to pay many of his debts as they had come due, and owed his snow removal subcontractors debts totaling approximately $3,600,000.  (Id. at 33-34).

In 2004, Allin engaged Centrus Group to help him find and attract investors and additional funding.  (Id. at pp. 33-34; Allin Depo. 1/22/07, Symbiot Exhibit 7, pp. 50-51).  Centrus Group reviewed the assets of Allin's businesses and concluded that they had positive value.  (Allin Depo. 1/22/07, p. 51).

On November 3, 2004, allegedly in response to rumors of Allin's financial difficulties, Heritage terminated the Snow Removal Contract and demanded that Allin return its deposit.  In an action filed in this Court, Heritage v. John Allin d/b/a Allin Companies and Snow Management Group, No. 04-333E (W.D. Pa.), this Court held that Heritage was entitled to reimbursement of the deposit, less actual expenses incurred by Allin "for all work or services performed and equipment and materials supplied to the date of termination."  (Transcript of Proceedings 6/21/06, Heritage's Exhibit H, pp. 4-5).

In or about October, 2004, Allin commenced negotiations with Defendant Symbiot Business Group, Inc. (the "Corporation") relative to the potential purchase of the assets of Snow Management Group.  As a result of these negotiations, Allin, as seller, and the Corporation and Symbiot Snow Management Network, LLC (the "LLC"), as buyers, entered into a formal Asset Purchase Agreement ("APA") pursuant to which Allin sold his snow removal and management

business to the Symbiot entities. (APA, Heritage's Exhibit G; Allin Depo. 1/23/06, pp. 79). In exchange for the transfer of assets, Allin received the following:

(a) The assumption, by the LLC, of specified trade payables up to a maximum amount of $4,000,000, as shown on Section 3(p)(ii) of the disclosure schedules. (APA, p. S13).

(b) The assumption, by the LLC, of up to $2,000,000, of amounts Allin owned to National City Bank on a promissory note.

(c) The assumption, by the LLC, of Allin's liability under contacts which became "Acquired Contracts" under the APA.

(d) $10,000 payment toward Allin's legal expenses..

(e) $50,000 cash, paid to Allin' counsel. (APA, p. S15).

(f) 500,000 share of stock in the Corporation. (APA, p. S15).

(g) The ability to earn up to $1,500,000 in additional cash payments if certain revenue targets were met. (*Id.*).

(h) $250,000 cash, paid over five years, for Allin's agreement not to compete. (*Id.*).

(i) An employment contract under which Allin would receive a base salary of $139,800 per year during his first year of employment, plus benefits and bonus opportunities.

(APA, pp. S321-34; Allin Depo. 1/23/06, pp. 35-36; Allin Depo. 1/22/07, pp. 66-76). The APA referred to the Heritage litigation in a disclosure schedule in § 3(s):

> For all litigation claims below, [Symbiot] has assumed the Accounts Payable as an Assumed Liability but not the cost of litigation on behalf of the claimant or plaintiff.

**LITIGATION**

Champlain Valley Property Services, Inc. v. Snow Management Group in Vermont State Court in the amount of $95,000.

Christine McConnell, dba C.C. Landscape and Design v. Greg Yandow and Allin Compaies, dba Snow Management Group, Chittenden County Vermont in the amount of $11,300.

Meadowlands Cleaning Services, Inc. v. John A. Allin d/b/a Snow Management Group, et al. Docket No. BBRL- 1289-04, Superior Court of New Jersey, Bergen County in the amount of $18,045.75.

**Heritage Realty Management Group, Inc. v. John Allin d/b/a Allin Companies and Snow Management Group, In the United States District Court for the Western District of Pennsylvania in the amount of $340,482.90.**

(APA, Disclosure Schedule, §3(s) (emphasis added)). Section 3(p)(ii) of the APA purports to contain a listing of all accounts payable that the LLC agreed to assume as part of the asset purchase. Heritage is not listed in Section 3(p)(ii). (APA, pp. S28, S196-206).

The closing on the APA occurred on November 3, 2004. On November 22, 2004, Allin and Symbiot entered into a "Letter Agreement" modifying some of the terms of the APA. (APA, pp. S388-91). In that Agreement, the LLC agreed to "assume all obligations of Seller, up to $170,000 in the aggregate," with respect to the Heritage litigation pending in this Court. (APA, p. S389). The Letter Agreement further provided that, "[i]n the event of a conflict between this Letter Agreement and the Purchase Agreement, this Letter Agreement shall prevail." (Id.)

Following the closing, Symbiot assumed the business operations of Allin's snow removal business, maintaining those operations from the same premises and facilities previously utilized by Allin. Symbiot retained all of the key staff and management personnel, including Allin and his wife, Peggy Allin, and used the same equipment that Allin had previously used in his snow removal operations. (Allin Depo. 1/23/06, pp. 35-36).

On February 23, 2006, Heritage filed the instant complaint asserting, *inter alia*, claims based upon actual fraud (Count One), constructive fraud (Count 2), and successor liability (Count

6).[1]  On December 15, 2006, Symbiot filed a First Motion for Partial Summary Judgment, moving for judgment on Heritage's successor liability claim.  On January 16, 2007, Heritage responded by filing a Cross-Motion for Partial Summary Judgment on the successor liability claim.  On February 6, 2007, Symbiot filed a Second Motion for Summary Judgment seeking dismissal of all claims.  These motions are ripe for review.

## II.     STANDARD FOR REVIEW

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  In order to withstand a motion for summary judgment, the non-moving party must "make a showing sufficient to establish the existence of [each] element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  In evaluating whether the non-moving party has established each necessary element, the Court must grant all reasonable inferences from the evidence to the non-moving party.  Knabe v. Boury Corp., 114 F.3d 407, 410, n.4 (3d Cir. 1997) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986)).  "Where the record taken as a whole could not lead a reasonable trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  Id.  (quoting Matsushita, 475 U.S. at 587).

## III.    ANALYSIS

---

[1]     Heritage also asserted counts based upon unjust enrichment and tortious interference and seeking a constructive trust, but has since withdrawn those claims.  (See Transcript of Oral Argument, May 29, 2007).

"As a general rule," under Pennsylvania common law, "when one company sells or transfers all its assets to another, the successor company does not embrace the liabilities of the predecessor simply because it succeeded to the predecessor's assets." McClinton v. Rockford Punch Press & Manufacturing Company, 549 F.Supp. 835, 837 (E.D.Pa. 1982). Pennsylvania Courts, however, recognize four exceptions to the general rule of nonliability. Where (1) the purchaser of assets expressly or impliedly agrees to assume obligations of the transferor; (2) the transaction amounts to a consolidation or *de facto* merger; (3) the purchasing corporation is merely a continuation of the transferor corporation; or (4) the transaction is fraudulently entered into to escape liability, a successor corporation may be held responsible for the debts and liabilities of its predecessor. Philadelphia Elec. Co. v. Hercules, Inc., 762 F.2d 303, 308-09 (3rd Cir. 1985); Granthum v. Textile Machine Works, 326 A.2d 449 (Pa 1974). In addition, Pennsylvania recognizes a "product-line" exception in products liability cases. Continental Insurance Company v. Schneider, Inc., 582 Pa. 591 (2005). The Third Circuit notes that the "de facto merger and mere continuation . . . are generally treated identically." Berg Chilling Systems, Inc. v. Hull Corporation, 435 F.3d 455, 464-65 (3rd Cir. 2006). Here, Heritage asserts that Symbiot is liable as a successor under both the express assumption of liability exception and under the *de facto* merger/continuation exception. We first address the merits of Symbiot's Motion for Partial Summary Judgment relative to Heritage's successor liability claim.

As a preliminary matter, Symbiot argues that successor liability under a *de facto* merger theory does not apply to a transfer or sale from a sole proprietor to a corporation. In support of its argument it relies on several cases decided under the product line exception to successor liability including dicta from LaFountain v. Webb Industries Corp., 951 F.2d 544 (3rd Cir. 1991), wherein the Court noted that:

> In the context of a sale of asserts, a successor corporation may sometimes be held liable so as to protect creditors of the predecessor corporation. Corporate law provides such protection because a corporation is an entity created by statute that can be dissolved at any time, thus leaving creditors, including those

>     injured by the products of the predecessor, without a cause of
>     action. A sole proprietor, on the other hand, remains liable for his
>     debts and liabilities.

LaFountain, 951 F.2d at 547-48 (footnote omitted). The LaFountain Court also observed that the product line exception includes a distinct requirement that a plaintiff "lack . . . a remedy against the predecessor" in order to succeed. LaFountain, 951 F.2d at 548 (noting that, although the selling entity was operated as a sole proprietorship, "[t]he character of the predecessor entity does not change the outcome here because one of the prerequisites of the product line exception - lack of a remedy against the predecessor - has not been established.").

Symbiot contends that successor liability should not apply to a transfer from an individual or a partnership because, unlike in a situation where a corporation transfers its assets and then dissolves, an individual does not disappear and remains liable. See, e.g., Pendergrass v. Card Care, Inc., 424 S.E.2d 391, 395 (N.C. 1993) ("If all the assets of a corporation are transferred, a claim against the transferring corporation might be worthless. When a partnership transfers its asserts, the partners remain liable."); Dale v. Webb Corporation, 252 F.Supp.2d 186 (E.D.Pa. 2003) (holding that a transfer from a sole proprietor will not support a finding of successor liability because the sole proprietor remains in existence and liable after the transfer).

Each of the Pennsylvania cases relied upon by Symbiot addresses successor liability under the product line exception, a concept not applicable to Heritage's claims. The well-established elements of successor liability based upon *de facto* merger in Pennsylvania are as follows:

>     (1) There is a continuation of the enterprise of the seller
>     corporation, so that there is continuity of management, personnel,
>     physical location, assets, and general business operations.
>
>     (2) There is a continuity of shareholders which results from the
>     purchasing corporation paying for the acquired assets with shares
>     of its own stock, this stock ultimately coming to be held by the
>     shareholders of the seller corporation so that they become a
>     constituent part of the purchasing corporation.

> (3) The seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible.
>
> (4) The purchasing corporation assumes those obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation.

Berg Chilling, 435 F.3d at 468-69 (citing Philadelphia Electric, 762 F.2d at 310).  The *de facto* merger test does not require as an element the lack of a remedy against the predecessor.

Thus, the holdings in LaFountain and the remaining product line cases cited by Symbiot are distinguishable.  Indeed, Symbiot concedes that their argument has not been adopted by any Pennsylvania court or Federal court applying Pennsylvania law.

Where the "purchaser of assets expressly or impliedly agrees to assume obligations of the transferor," the purchaser of a business also succeeds to the liabilities of the transferor.  Philadelphia Elec. Co. v. Hercules, Inc., 762 F.2d 303, 308-09 (3rd Cir. 1985).  Heritage's Motion for Partial Summary Judgment contends that, in the Asset Purchase Agreement, Symbiot expressly assumed Allin's debt to Heritage "in the amount of $340,482.90." The reference to the Heritage litigation and its potential liability in the APA is contained in §3(s) of the Disclosure Schedule:

> For all litigation claims below, [Symbiot] has assumed the Accounts Payable as an Assumed Liability but not the cost of litigation on behalf of the claimant or plaintiff.
>
> **LITIGATION**
>
> Champlain Valley Property Services, Inc. v. Snow Management Group in Vermont State Court in the amount of $95,000.
>
> Christine McConnell, dba C.C. Landscape and Design v. Greg Yandow and Allin Compaies, dba Snow Management Group, Chittenden County Vermont in the amount of $11,300.
>
> Meadowlands Cleaning Services, Inc. v. John A. Allin d/b/a Snow Management Group, et al. Docket No. BBRL- 1289-04, Superior Court of New Jersey, Bergen County in the amount of $18,045.75.
>
> **Heritage Realty Management Group, Inc. v. John Allin d/b/a Allin Companies and Snow Management Group, In the United**

**States District Court for the Western District of Pennsylvania in the amount of $340,482.90.**

(APA, Disclosure Schedule, §3(s) (emphasis added)). Heritage contends that this recitation of liabilities constitutes "a plain and paradigmatic example of express assumption of liability by the purchaser of a business." (Cross-Motion for Summary Judgment, Dkt. #24, p. 8).

Symbiot, on the other hand, asserts that Heritage misinterprets the APA with respect to the section governing assumption of liabilities. Symbiot emphasizes the preamble to Section 3(s), wherein it states that Symbiot "assumed the Accounts Payable as an assumed liability" for the claims listed in that section. "Accounts Payable," according to Symbiot, refers to another schedule - Section 3(p)(ii) - where some of the litigation claims identified in Section 3(s) are also listed as accounts payable. The Heritage claim against Allin is listed in Section 3(s) but not in Section 3(p)(ii). According to Symbiot, Section 3(s) is simply a listing of all potential and pending litigation claims against Allin, with only those listed in Section 3(p)(ii) being expressly assumed.

Heritage and Symbiot each contend that the APA unambiguously supports their interpretations as to its operative effect. However, we need not resolve this issue. Whatever ambiguities may have existed in the body of the APA document relative to the extent, if any, to which Symbiot had contractually assumed the Heritage liability, Allin and Symbiot resolved those ambiguities through the execution of the Letter Agreement. Under the terms of that Agreement, the parties clearly and unambiguously agreed that Symbiot would expressly assume $170,000 of the Heritage liability. The Letter Agreement, moreover, contains an express declaration that, "[i]n the event of a conflict between this Letter Agreement and the Purchase Agreement, [the] Letter Agreement shall prevail." (APA, pp. S388-391). Accordingly, Plaintiff's Motion for Summary Judgment, which seeks judgment for the entire $340,482.90 exclusively on the basis of the APA, must be denied.

Symbiot, in turn, moves for summary judgment as to the Letter Agreement by arguing that the Agreement, by its express terms, "is not intended to confer upon any Person not a party hereto

any rights or remedies hereunder." Id.; see, e.g., Banknorth, N.A. v BJ's Wholesale Club, Inc., 442 F.Supp.2d 206, 211 (M.D. Pa. 2006). Heritage counters, however, that it is not suing as a third party beneficiary, but on a variant of successor liability, ie, an express assumption of liability theory. We find this position to be well taken. Here, although at first blush the distinction may seem somewhat nuanced, Heritage is not, in the classic sense, "suing on the contract" as a third-party beneficiary. Heritage is not suing to enforce any part of the contract, but is simply relying on the contract to demonstrate that Symbiot expressly assumed a portion of the Heritage liability, as required to make out a claim of express assumption successor liability.

Although the debts and liabilities of a transferring company are not normally passed to the purchaser when one company sells its assets to another, "if circumstances indicate that there was a *de facto* consolidation or merger of the corporations or that the purchasing company was a 'mere continuation' of the selling company, liability may attach." Berg Chilling, 435 F.3d at 468. In determining whether a transaction is a *de facto* merger or continuation, courts look to the following factors:

> (1) There is a continuation of the enterprise of the seller corporation, so that there is continuity of management, personnel, physical location, assets, and general business operations.
>
> (2) There is a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation.
>
> (3) The seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible.
>
> (4) The purchasing corporation assumes those obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation.

Berg Chilling, 435 F.3d at 468-69 (citing Philadelphia Electric, 762 F.2d at 310).

In evaluating the four factors, the second factor - continuity of ownership - is considered by Pennsylvania courts to "be critical to a successful successor liability claim under Pennsylvania law." Id. (citing Forrest v. Beloit Corp., 278 F.Supp.2d 471, 477 (E.D. Pa. 2003). The Third Circuit emphasizes the ownership factor without relying on it exclusively. Id. at 469. Moreover, the test is flexible, and a court need not find every element to conclude that a *de facto* merger took place. See, e.g., T.H.S. Northstar Associates v. W.R. Grace and Co.-Conn., 840 F.Supp. 676, 678 (D. Minn. 1993). Each party agrees that there are no material issues in dispute as to this claim, so we will proceed to consider each factor in turn.

In Berg Chilling, the Court emphasized that "enterprise," for purposes of successor liability analysis, focuses on "the continuity of the corporate entity, not the continuity of the business operation." Id. In Berg Chilling, the purchasing corporation, SPI, took over all of the assets of one division of the transferring corporation, Hull. Hull, however, remained in existence as a corporate entity with several other divisions and maintained its identity and control on the corporate level. The Court held that the continuation of enterprise factor, therefore, was not satisfied. Id.

A similar situation is presented here, where Allin sold his snow removal business and assets to Symbiot, but retained his other business enterprises. In both Berg Chilling and in the instant case, the purchasing company took over the facilities, equipment, and contractual obligations of the selling company. In both cases, the chairman/owner of the transferred division/company received a position with the seller corporation. Nonetheless, in Berg Chilling, as here, the transferor retained its other business ventures and enterprises and retained its own identity. Hull remained in existence as a corporate entity even after selling the assets of one division to SPI, just as Allin remained the sole proprietor of his landscaping and snow melting businesses after the sale of his snow management operations to Symbiot. As in Berg Chilling, we find no complete continuity of enterprise following Allin's sale of his snow removal assets. Berg Chilling, 435 F.3d at 470 (holding that, "while it is clear that two divisions combined operations as a result of the APA, there is no support for the proposition that SPI continued Hull's corporate enterprise.").

The continuity of ownership factor looks to "continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock," and is the "critical" factor in determining successor liability. Berg Chilling, 435 F.3d at 468. The key inquiry in determining continuity of ownership is "whether the owners retained some ongoing interest in their assets." United States of America v. General Battery Corp., Inc., 423 F.3d 294, 307 (3rd Cir. 2005).

Here, Allin received, in addition to cash and relief from debts and liabilities, 500,000 shares of stock in Symbiot Corporation. Symbiot characterizes this stock as a minimal part of the transaction, noting that Allin acquired an interest in only 3.1% of the outstanding shares of the Corporation. (Glover Affidavit, Symbiot Exhibit 8). Symbiot further emphasizes that this percentage had little immediate value and was not sufficient for Allin to elect anyone to the Board of Directors. (Id.)

There is no bright line rule as to what percentage of ownership must be acquired by the seller to constitute continuity of ownership. Symbiot cites cases where 71% and 41.26% of outstanding shares, portions far greater than that conveyed to Allin, were deemed sufficient. See In re Total Containment, Inc., 335 B.R. 589 (Bkrtcy E.D.Pa. 2005) (71% ownership after transfer is sufficient); In re Asousa Partnership, 2006 WL 1997426 (Bkrtcy E.D.Pa. 2006) (41.26% sufficient). In cases where no stock at all was exchanged, there is a strong presumption that there is no continuity of ownership and, therefore, no *de facto* merger. See Forrest v. Beloit Corp., 278 F.Supp.2d 471, 477 (E.D. Pa. 2003) ("Plaintiff's *de facto* merger claim must fail as a matter of law because the stock transfer element is absent from the 1986 transaction."); see also Pol Am Pack v. Redicon Corp., 2000 WL 1539079 (E.D. Pa. 2000).

As noted above, Allin received a portion of stock totaling only 3.1% of outstanding shares. This portion represented only a 1.7% interest in the outstanding rights to acquire shares, such as warrants and option rights. Given the *de minimus* percentage of stock, we note that Allin's share was insufficient to elect a single person, including himself, to the Board of Directors of the Corporation.

Moreover, whereas Allin was the sole owner and director of the Snow Management Group prior to the asset sale, he did not have any authority or decision-making ability in the Symbiot company following the sale. In light of the above, we find that this factor does not cut in favor of a finding of *de facto* merger or, at most, is neutral.

The third element looks to whether the seller "ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible." Berg Chilling, 435 F.3d at 469. This factor recognizes that an essential characteristic of a merger is that one corporation survives while the other ceases to exist. Here, this analysis is somewhat complicated by the fact, as discussed earlier, that Allin wore a number of "hats." He was the sole proprietor of a snow removal company, a landscaping company, and a fledgling snow melting company. Upon execution of the APA, Allin sold all of his snow removal assets to Symbiot, became an employee of Symbiot's new snow removal division, and executed a non-compete agreement preventing him from operating a snow removal business for a period of five years. However, Allin continued to operate his landscaping business and his snow melting business, retaining his name and identity in connection with each of these enterprises. Thus, there was not a complete cessation of business activities and, therefore, this factor weighs against a finding of *de facto* merger.

The final factor is whether the "purchasing corporation assumes those obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation." Berg Chilling, 435 F.3d at 469. Symbiot acknowledges that the newly formed snow removal company assumed many of Allin's obligations with respect to the snow removal business. (See Defendant's Memorandum in Support of their Second Motion for Summary Judgment, p. 37). Symbiot assumed approximately $6,000,000 in obligations and all of the "contracts, leases (including, without limitation, leases of real estate), accounts receivable, licenses and other agreements or arrangement of Seller used by Seller in the operation of the Business or necessary to conduct the Business as it has been conducted." (APA, p. 2). This factor weighs in favor of a *de facto* merger.

13

In summary, three of the four factors, including the critical continuity of ownership factor, weigh in varying degrees against a finding that a *de facto* merger took place. Only the fourth factor supports Heritage's position. Accordingly, Symbiot's Motion for Summary Judgment as to this claim is granted.

Heritage next contends that the transfer of Allin's assets to Symbiot violated the "actual fraud" provision of the Pennsylvania Uniform Fraudulent Transfer Act ("PUFTA"), 12 Pa. C.S.A. Section 5104(a)(1) which provides:

> **(a) General rule.** – A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> (1) with actual intent to hinder, delay or defraud any creditor of the debtor...

12 Pa. C.S.A. Section 5104(a)(1). For purposes of the PUFTA, "[t]he existence of fraudulent intent may be inferred from all facts and circumstances surrounding the conveyance." Tiab Communications Corp. v. Keymarket of Nepa, Inc., 263 F.Supp.2d 925, 934 (M.D. Pa. 2003) (citing Voest-Alpine Trading USA Corp. v. Vantage Steel Corp., 919 F.2d 206, 213 (3rd Cir. 1990)).

Specifically, Heritage contends that, when Allin received Heritage's deposit for snow removal services, Allin immediately transferred that money to Symbiot, if not directly, then by paying down debts and obligations incurred by Allin that would have been assumed by Symbiot. Heritage asserts that Allin never intended to use the deposit to perform Allin's contractual obligations to move snow for Heritage, particularly as Allin had transferred all of his assets to Symbiot pursuant to the APA. Symbiot responds that Heritage cancelled the snow removal contract and demanded return of the deposit from Allin despite the fact that Symbiot and Allin were fully prepared, even after the ratification of the APA, to perform the contracted services.

We find that there are material issues of fact as to fraudulent intent sufficient to preclude summary judgment in favor of Symbiot. The PUFTA sets forth several factors and circumstances from which fraudulent intent may be inferred:

      (1) the transfer or obligation was to an insider;

      (2) the debtor retained possession or control of the property transferred after the transfer;

      (3) the transfer or obligation was disclosed or concealed;

      (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

      (5) the transfer was of substantially all the debtor's assets;

      (6) the debtor absconded;

      (7) the debtor removed or concealed assets;

      (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

      (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

      (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

      (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

12 Pa. C.S.A. Section 5104(b).

      The record demonstrates that Allin transferred all of his snow removal assets to Symbiot (12 Pa. C.S.A. Section 5104(b)(5)), the transfer occurred shortly after a substantial debt to Heritage (the deposit of $340,482.90) was incurred (Section 5104(b)(10)), and, as we previously determined, Allin retained some possession or control over his assets in the form of an ownership interest through transfer of stock (Section 5104(b)(2)). Moreover, material issues of fact remain in dispute as to several additional factors. The parties disagree as to whether Allin was insolvent at the time that he transferred his assets to Symbiot. Symbiot denies that Allin was insolvent, noting that, when Allin retained Centrus Group, Centrus concluded that Allin's snow management business had positive net worth, despite the outstanding obligations. (Allin Depo. 1/22/07, pp. 51-52). Symbiot

further contends that it purchased Allin's assets for more than the sum of Allin's debts, creating a presumption that Allin was not insolvent. (Allin Depo. 1/23/06, 34-36).

Heritage, however, asserts that Allin had failed to pay his subcontractors for several months prior to executing the APA and that he owed snow removal subcontractors in excess of $3,600,000. (Allin Depo. 1/23/06, pp. 33-34). They further contend that his financial distress was such that he had been forced to engage a "work-out" firm, Centrus Group, to negotiate with unpaid contractors and seek an infusion of capital. (Allin Depo. 1/23/06, pp. 33-34, 49-51). Indeed, the PUFTA creates a presumption of insolvency where a debtor is generally not paying debts as they become due. See 12 Pa. C.S.A. Section 5102(b). Thus, Heritage has raised a triable issue of fact as to Allin's solvency at the time of the transfer.

The parties similarly dispute whether Allin received consideration for the transfer that was less than the value of the assets conveyed. Heritage contends that Symbiot received assets valued at $7,731,538. (Snow Management Balance Sheet, Heritage's Exhibit M). Allin received, as part of the asset transfer, a cash payment of $50,000, 500,000 shares of Symbiot stock, satisfaction of liabilities owed to Allin's creditors with a claimed value of over $6,000,000, and an employment position, mutually terminated shortly thereafter, with Symbiot Business Group. Determining the value of the stock shares would likely require expert testimony, as even Allin was unable to estimate what the stock shares were worth. (Allin Depo. 1/22/07, p. 69). Moreover, Heritage contends that Symbiot has not satisfied the debt that it assumed under the APA. (Allin Depo. 1/22/07, pp. 71-73).

In sum, we find that there is a triable issue of fact as to whether Allin transferred his assets to Symbiot with intent to defraud Heritage of the $340,482.90 deposit. Summary judgment as to this claim is denied.

The "constructive fraud" provision of the PUFTA is codified at 12 Pa. C.S.A. Section 5104(a)(2), and states:

> (a)  General rule. – A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim

>       arose before or after the transfer was made or the obligation was
>       incurred, if the debtor made the transfer or incurred the obligation:
>       
>                    *       *       *       *       *
>       
>       (2) without receiving a reasonably equivalent value in exchange
>       for the transfer or obligation and the debtor:
>       
>           (i) was engaged or was about to engage in a business or a
>           transaction for which the remaining assets of the debtor were
>           unreasonably small in relation to the business or transaction; or
>       
>           (ii) intended to incur, or believed and reasonably should
>           have believed that the debtor would incur, debts beyond the
>           debtor's ability to pay as they became due.

12 Pa. C.S.A. Section 5104(a)(2). As discussed above, there are material issues of fact in dispute as to whether Allin received a reasonably equivalent value in exchange for the transfer of his assets and his snow removal business and as to whether Allin was insolvent at the time of the transfer of his assets. Accordingly, summary judgment is denied as to this claim.

Symbiot, in the Second Motion for Summary Judgment, argues that Heritage has not produced any evidence relative to conduct on behalf of Symbiot Management Group, LLC, one of the three named Symbiot defendants, which could potentially subject it to liability under any of the asserted causes of action. We agree. Heritage, in its response brief, failed to identify any evidence that Symbiot Management Group, LLC, had any involvement in the matters at issue in this litigation. Accordingly, Symbiot Management Group, LLC, is dismissed from this action.

## IV.   CONCLUSION

For the reasons stated above, Symbiot's First Motion for Partial Summary Judgment and Heritage's Motion for Partial Summary Judgment are DENIED. Symbiot's Second Motion for Summary Judgment is GRANTED in part and DENIED in part. Specifically, Symbiot's motion is GRANTED as to Heritage's claim of successor liability based upon the *de facto* merger doctrine and DENIED as to Heritage's claims of actual and constructive fraud.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| HERITAGE REALTY MANAGMENT, INC., ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | C.A. No. 06-47 Erie |
| ) | District Judge McLaughlin |
| SYMBIOT SNOT MANAGEMENT NETWORK, ) | |
| LLC, *et al.*, ) | |
| ) | |
| Defendants. ) | |

**ORDER**

AND NOW, this 28th day of September, 2007, and for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that Symbiot's First Motion for Partial Summary Judgment and Heritage's Motion for Partial Summary Judgment are DENIED. Symbiot's Second Motion for Summary Judgment is GRANTED in part and DENIED in part. Specifically, Symbiot's motion is GRANTED as to Heritage's claim of successor liability based upon the *de facto* merger doctrine and DENIED as to Heritage's claims of actual and constructive fraud.

/s/ Sean J. McLaughlin
United States District Judge

cm: All parties of record. ___